## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROLAND H. BICKLEY, on behalf of Georgia Pacific Corporation Life Health and Accident Plan, and all other similarly situated Plans,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.: CV-02-HS-2197-S** |
| **CAREMARK RX, INC., and CAREMARK, INC.** | ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION</u>

This is a class action brought by Plaintiff Roland Bickley on behalf of the Georgia Pacific

Corporation Life Health and Accident Plan and all other similarly situated self-funded prescription

drug Plans that use the services of Defendants Caremark Rx, Inc. and its subsidiary, Caremark, Inc.,

as a Pharmacy Benefits Manager.   The action is brought under § 502(a)(2) of the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3).

### <u>Background and Procedural Posture</u>

Roland Bickley ("Bickley") brings this action as a member of the Georgia Pacific Plan  (the

"Georgia Pacific Plan" or "the Plan"),[1] and all other similarly situated Plans.   Caremark, Inc.

("Caremark") is the Pharmacy Benefits Manager ("PBM") of the Georgia Pacific Plan, which is self

funded by Georgia Pacific[2].   For various fees (depending upon what service is being provided),

Caremark manages and administers the Plan's prescription drug program.   In doing so, Caremark

buys drugs from manufacturers, sells drugs to retail pharmacies and operates a service where Plan

---

[1]  The Plan is not a party, nor did it authorize the filing of this action.

[2]  As opposed to funding by an insurance company in return for premiums.

members can fill their prescriptions through the mail.  Caremark negotiates prescription drug prices with both drug manufacturers and dispensing retail pharmacies.  And, as noted, it offers a mail order pharmacy service that essentially competes against retail pharmacies.

The gravamen of Bickley's assertions is that Caremark enriches itself through undisclosed discounts, rebates, coupons and other forms of compensation from drug companies and pharmacies; through a price differential or "spread" created by Caremark's negotiating a second discount with pharmacies; and a second price "spread" in the dispensing fee paid by the Plan to Caremark and by Caremark to the retail pharmacies that fill Plan members' prescriptions.  Bickley also says that Caremark circumvents the "best pricing" rules set forth in the Omnibus Reconciliation Act, 42 U.S.C. § 1396r-8, and uses its market power and position to favor some drugs over others ("drug-switching program") in exchange for monies received from the drug manufacturer(s).  Bickley says Caremark does not disclose any of these practices and monies received to the Plan or Plan members.  Bickley says Caremark does these things using Plan assets (money).  He says Caremark breaches its duty to the Plan and Plan members by not disclosing these arrangements and practices to the Plan, and by keeping the monies earned, which Bickley says should go to the Plan for the benefit of its members.  Bickley says Caremark is a Plan fiduciary and its practices violate its fiduciary duty(ies) to the Plan.[3]

Caremark denies it has done anything illegal and attacks Bickley's ability to bring and maintain this action.  Caremark denies it is an ERISA fiduciary, denies Bickley has standing to maintain this action, and says Bickley has failed to exhaust his administrative remedies.

The case was originally filed in the United States District Court for the Southern District of

---

[3]  There is no allegation that the Plan trustees have breached their fiduciary duties.

California, and transferred here on venue grounds.  Caremark Rx, Inc. is a Delaware corporation with its principal place of business in Birmingham, Alabama.  Caremark, Inc. is a subsidiary of Caremark Rx, Inc. and a resident of Illinois.

Currently pending are Bickley's Motion for Class Certification (doc. 75) and Caremark's Motion to Dismiss the Second Amended Complaint ("SAC") (doc. 49), as supplemented, and Caremark Rx, Inc.'s Motion to Dismiss (doc. 50).  The Motion to Dismiss, Bickley's opposition and the parties' related filings raise a number of ERISA questions, among them waiver, standing, who can be an ERISA fiduciary, and exhaustion of administrative remedies.  Caremark, Rx, Inc. also moves to dismiss on the basis that it is not a PBM.

The parties have thoroughly briefed the issues, including authority from other district courts facing similar if not identical questions.  If Caremark's Motion To Dismiss is granted, the class certification motion is moot.

## Discussion

### I. Applicable Law

This action is a federal question case and the court is not bound by the *Van Dusen - Ferens* rule that a transferee court must apply the law that would have been applied in the transferor court, so that a change in forums will mean a change in courtroom, but not a change of law.  *Van Dusen v. Barrack*, 84 S.Ct. 805, 821, 376 U.S. 612, 639, 11 L.Ed.2d 945 (1964) (when transfer in a diversity case is made on motion of defendant, transferee court must apply substantive law of transferor court); *Ferens v. John Deere Co.*, 110 S.Ct. 1274, 494 U.S. 516, 108 L.Ed.2d 443 (1990) (same principle applies when plaintiff moves for venue transfer).  The Court in both *Van Dusen* and *Ferens* spoke quite explicitly of diversity cases.  "This suggests that in a federal-question case the

3

transferee court is free to think for itself what federal law is and need not mechanically apply the view of federal law that is taken in the circuit from which the case was transferred". Wright, *Law Of Federal Courts*, (5th Ed., 1994)  § 44 at 281 West; *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171 (D.C. Cir.), *aff'd on other grounds*, 109 S.Ct. 1676, 490 U.S. 122, 104 L.Ed.2d 113 (1987).  The distinction is potentially significant; for example, the court's cursory review of Ninth Circuit exhaustion law suggests that the Ninth Circuit is more willing to excuse the failure to exhaust administrative remedies than the Eleventh Circuit.  Having said that, the court hopes that the federal forum distinction would, upon closer examination, be less likely to be dispositive -- Caremark Rx and Georgia-Pacific both have their principal places of business in the Eleventh Circuit (Birmingham, Alabama  and Atlanta, Georgia, respectively).  The January 1, 1995, Integrated Agreement between Caremark, Inc.(an Illinois subsidiary of Caremark Rx) and Georgia-Pacific ('the First Agreement") recites that it will be construed under the laws of Georgia.  *Declaration of Stephanie Sawyer*, Ex. A., page 17, filed May 10, 2002 Under Seal for June 10, 2002 Hearing.  The 2001 Prescription Benefit Management Agreement, Ex. B to Declaration of Stephanie Sawyer ("the PBM Agreement"), recites that Illinois law will govern the PBM Agreement and its interpretation.  A reasonable assumption from the two (2) prescription drug plan agreements would be that the parties contemplated that any federal law questions would most likely be decided in the Eleventh Circuit, with the Seventh Circuit being a second choice.[4]

## II.  Standard Of Review

In passing on a Motion To Dismiss, the court accepts all of Bickley's well-pled allegations

---

[4]  Bickley does not agree, saying that Caremark engineered the transfer of the action here by procedural sleight of hand and that exhaustion would not be required in the Ninth Circuit. Plaintiff's Supplemental Brief in Opposition to Motion to Dismiss, page 4, text and fns.9 - 11.

as true, and grants him all the favorable inferences that can be drawn from those allegations.  *E.g., Wagner v. Daewoo Heavy Inds. America Corp.*, 289 F.3d 1268, 1271 (11th Cir. 2002).  The court may consider the full text of documents referenced in, or central to, the allegations of the complaint.  *See Brooks v. Blue Cross and Blue Shield of Florida, Inc*., 116 F.3d 1364, 1369 (11th Cir. 1997).  If an allegation in the Complaint is based on a writing and the writing contradicts the allegation, the writing controls.  *See Assoc. Builders, Inc. v. Alabama Power Co*., 505 F.2d 97, 100 (5th Cir. 1974).[5] The court has reviewed and considered the Plan, the First Agreement and the PBM Agreement.

### III.  The Georgia Pacific Plan

The Georgia Pacific Plan, called *Life*Choices, is a combination benefits plan composed of Accidental Death and Dismemberment, Weekly Sickness and Accident Benefit, Medical Care Program, and Dental Care Program.  It is attached as an Exhibit to Caremark's Motion To Dismiss First Amended Complaint. (Doc. 62.)  Georgia-Pacific is identified as the Plan sponsor and the Plan Administrator.  *Plan*, at 81.  Wausau is identified at page 3. as the Benefits Claim Processor of the Plan ("Plan BCP").  The Plan says that the Plan Administrator has delegated to Wausau as Plan BCP "the administrative and interpretive discretion to resolve medical, dental and life claims denials and appeals under the Plan's claims procedure".  *Plan*, p. 81.

The procedure to file a claim for benefits is described in Section 25, p. 78 entitled, <u>How To File A Claim</u>.  Caremark is identified there as the Benefits Claim Processor for prescription drug benefits ("Drug Plan BCP").  *Id*.  If a claim is denied, the BCP will provide the plan member, in writing, with the reasons for denial, the plan provisions that are the basis for denial, an explanation

---

[5]  Decisions of the Fifth Circuit handed down by that court prior to the close of business September 30, 1981 are binding precedent on courts in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

of what other material or information is needed and why it is needed, and an explanation of the claims review process.  If the member disagrees with the decision, the member may request a review of the decision by notifying the BCP in writing.  The member will be able to examine all the materials related to the claim, and the Plan's official documents.  The member has the right to review those materials and appear before the BCP.  Wausau will decide the appeal within 60 days of when received or 120 days "in special situations".  *Id*.  Wausau, as Plan BCP, decides appeals, which would include appeals involving prescription drug benefits claims.

The Plan is funded by contributions from Georgia-Pacific Corporation, "and, in certain cases, by contributions from participants".  Employee contributions are transferred to a trust or an insurance company.   The Plan provides that Georgia-Pacific will share the monthly cost for medical and dental coverages for the Plan members and eligible dependents, and the Company will pay the cost of all other coverages.  *Plan*, p. 15.  While not essential to the court's analysis, the court cannot tell from the Plan whether employees pay anything (other than the shared costs described in the previous sentence) that funds the prescription drug part of the Plan and whether drug co-pays or deductibles fall under "contributions from members".  In any event, drug benefit payments made by Georgia-Pacific are paid from the Georgia-Pacific Corporation Master Trust for Health and Welfare Benefits Plan.  *Plan*, p. 82.

Section 27 of the Plan (Plan Details, at 83) describes Plan Member's ERISA rights such as examination of all documents governing the Plan and copies of the Form 5500 annual reports, and obtaining a copy of a summary of the Plan's annual financial report.  That page makes reference to Plan fiduciaries and has language that says if a member has a claim for benefits which is denied or ignored in whole or in part, the member may file suit in a state or federal court.  Further, if it should

happen that Plan fiduciaries misuse the Plan's money, "you" (the member) may seek assistance from the U.S. Department of Labor ("DOL"), ". . . or you may file suit in federal court". *Id*.

The Prescription Drug Program is Section 17 of the Plan.  It includes a retail and mail service program.  Caremark is the claim processor for both programs.

The Plan contains phone numbers for all of the BCP's, including Wausau, at page 3.  The Plan also provides that Georgia-Pacific shall act through its Chairman, Vice-Chairman, CEO, President, CFO, Vice President of Compensation of Benefits or Vice President - Human Resources. *Plan* at 84.  The Plan states that members having questions about the plan should contact the Plan Administrator.  *Id*. at 83.

Of some significance is that the Plan says that Georgia-Pacific has the exclusive responsibility and complete discretionary authority to control the operation and administration of the Plan, with power to resolve all interpretative, equitable, and other questions that arise in the operation of the Plan.  *Id*. at 81.

### IV.  The Caremark - Georgia Pacific Drug Prescription Plan Agreements

As noted above, there have been two (2) Drug Prescription Plan agreements.  The First Agreement, dated January 1, 1995 (Exhibit A to the Declaration of Stephanie Sawyer, *supra*), between Georgia-Pacific and Caremark, Inc., is eighteen (18) pages long; sixty-one (61) pages counting the First and Second Amendments.  Paragraph 14 of the First Agreement, at pp. 15 - 16, provides that Georgia-Pacific has the sole authority to control and administer the Plan, and that Caremark is to provide the described services in accordance with the Plan Administrator's policies, instructions, interpretations, rules, practices and procedures.  It further provides that "...nothing in this Agreement shall be deemed to confer upon Caremark the status of fiduciary as defined by

7

ERISA". *Id.* Georgia-Pacific, the Plan Administrator, has the sole right to resolve disputed claims and will notify Caremark of such resolution. *Id.*

The second agreement (Exhibit B to the Declaration of Stephanie Sawyer, *supra*), dated April 1, 2001, also between Caremark, Inc. and Georgia-Pacific ("the PBM Agreement"), like the First Agreement, was filed under seal, and no party has moved to unseal it.[6] The 2001 Agreement is brief, six (6) pages not counting exhibits or attachments. Like the First Agreement, the PBM says Georgia-Pacific has sole authority to control and administer the Plan, and that nothing in the Agreement shall be deemed to create ERISA fiduciary status for Caremark. A fair reading of the PBM Agreement is that Caremark's role is, as it was under the First Agreement, managerial/ministerial, as opposed to discretionary or policy making. Caremark is to

> manage [the Plan's] prescription benefit, including the provision of the following products and services in accordance with the Plan design features communicated by Client to Caremark. Such Plan design features shall be consistent with the summary attached as Exhibit F to this Agreement and as further specified in the Plan design document approved by [Georgia-Pacific].

The services provided include, *inter alia*, a mail service pharmacy, a retail pharmacy, claims processing, customer service toll free lines, and a formulary program. Caremark also has to maintain records as required by law.

Page 2, e. <u>Formulary Program</u> of the PBM Agreement, provides in part:

> **"Caremark may hold contracts with manufacturers of products covered under this Agreement and in connection with such contracts, Caremark may have a financial relationship with such manufacturers and may receive rebates from such manufacturers."**

------

[6] The schedules and other documents attached to the PBM Agreement probably contain proprietary and confidential information; the PBM Agreement itself, in the court's view, does not. The same is true of the First Agreement.

As noted, Section 4.b., page 3, <u>Control of Plan</u> of the PBM Agreement provides that Georgia-Pacific shall have sole authority to control and administer the Plan, and that nothing in the Agreement shall be deemed to confer upon Caremark the status of ERISA fiduciary.[7]  This section also says that "[Georgia-Pacific] has the sole right to resolve disputed claims and shall promptly inform Caremark  of such resolution."

## V.  Bickley's Claims

The court is mindful of both the rulings and observations of superior courts about ERISA's integrated  scheme, a scheme which the Supreme Court  earlier this year again made clear applies to enforcement actions:

> ERISA's "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement."  *Russell,* 473 U.S., at 147, 87 L.Ed. 2d 96, 105 S.Ct. 3085 . . .  This integrated enforcement mechanism, ERISA § 502(a), § 29 U.S.C. 1132(a) [29 USCS § 1132(a)], is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans.

*Aetna Health Inc. v. Davila*, 124 S.Ct. 2488, 2495 (2004).  The Court went on to describe § 502(a) as a comprehensive civil enforcement scheme

> . . . that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans.  The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.  The six carefully integrated civil enforcement provisions in § 502(a) of the statute as finally enacted . . . provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.

---

[7]  For the reasons discussed in D. <u>Fiduciary Status</u>, *infra*, the court says that this ERISA fiduciary exculpatory language has no effect whatsoever on whether or not Caremark is an ERISA fiduciary.

*Id*. [citations omitted].  While Bickley's claims are not state law claims, the integrated nature of ERISA's statutory scheme, especially its enforcement scheme, is the framework governing the court's analysis of Bickley's claims.

A.  <u>Failure to State a Claim</u>

Caremark Rx, Inc. moves to dismiss because it is not a PBM, hence has no privity with the Plan or its members, and therefore no fiduciary duty to either.  Bickley's use of  the collective "Caremark" throughout the SAC muddies the analysis.  Assuming for analysis' sake that Caremark Rx, Inc. is identical in status and function as Caremark, Inc., for the reasons set out in the analysis of the Caremark (Inc.) motion to dismiss, Caremark Rx, Inc. is entitled to the same relief as Caremark, Inc.  Alternatively, because Caremark Rx, Inc. is not a party to the First Agreement or the PBM Agreement, the court would dismiss Caremark Rx, Inc. anyway.  The Plan clearly identifies Caremark, Inc. as the prescription drug claims processor, Plan at p. 3.[8]

B.  <u>Waiver</u>

Bickley says that Caremark waived its right to assert standing, fiduciary status and exhaustion by not asserting them in the District Court in California.  The court does not agree: a Motion to Transfer on venue grounds, which Fed. R. Civ. P. 12(b)(3) requires to be raised in a defendant's responsive pleading or by motion, does not waive the assertion of defenses other than the remaining 12(b) defenses, i.e. Fed. R. Civ. P.12(b)(1), (2) and (4) - (7).  Standing and exhaustion are not 12(b) defenses, nor is ERISA fiduciary status.  The court does not find waiver of these matters by Caremark, and is unwilling to infer waiver.

_____

[8] The court does not accept Bickley's assertion that a SEC Form 10-K filing by Caremark Rx, Inc. places Caremark Rx, Inc. into contractual privity with the Plan where, as here, there are written agreements which Caremark Rx, Inc. has not executed.

C. Standing

Caremark, citing *Moore v. Am. Fed'n of TV & Radio Artists*, 216 F.3d 1236 (11th Cir. 2000), *cert. denied sub nom. Moore v. AFTRA Health & Retirement Funds*, 533 U.S. 950, 121 S.Ct. 2592, 150 L.Ed.2d 751 (2001), says that allowing a Plan beneficiary such as Bickley to bring an ERISA enforcement action for breach of fiduciary duty against a third party such as Caremark "permits that beneficiary to substitute his or her own judgment for that of the trustees", 216 F.3d 1236, 1245-46. Caremark also says that even in those circuits such as the Second and Third Circuits which have "relaxed" standing rules, the Plaintiff must still allege that the Plan trustees breached their fiduciary duty in failing to take the desired action.  Bickley does not so allege.

*Moore, supra*, was brought by recording artists against record companies and involved, as a case of first impression, the viability of derivative claims brought (on the AFTRA Plan's behalf) under section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), and claims for injunctive relief under section 509(a)(3), 29 U.S.C. § 1132(a)(3).  The Court rejected the viability of Moore's claims.[9]

Bickley, however, properly points out that he does not bring suit under 502(g)(2) of ERISA. Bickley sues for breach of fiduciary duty on behalf of similarly situated Plans under section 509(a)(2), 29 U.S.C. § 1132(a)(2) and section 409, 29 U.S.C. § 1109, seeking redress under 29 U.S.C. § 1132(b)(3) (which provides for injunction or other equitable relief) by way of restoration to the Plan of the "ill gotten" Plan assets[10], and disgorgement to the Plans of all profits resulting from

---

[9]  The court notes that in *Moore*, the trial court originally dismissed the action in part for failure to exhaust, which failure the *Moore* plaintiffs cured.

[10]  Meaning the coupons, discounts, and other financial gains realized by Caremark using the money and prescription business realized from the PBM Agreement and other plans' PBM agreements.

the fiduciary duty breaches.

Section 409 of ERISA provides

**(a)** Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Section § 502(a)(2), the second of ERISA's "six carefully integrated civil enforcement provisions",[11] expressly authorizes a civil action "by a [plan] participant." Such participants, e.g. Bickley, cannot obtain either compensatory or punitive money damages under § 409(a), only "appropriate equitable relief" pursuant to § 502(a)(3). Only the plan itself may seek money damages, *Russell*, *supra*.[12] The Supreme Court has held that § 502 relief excludes extra-contractual, punitive damages, and other monetary damages. *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993).[13] Courts have, however, been creative in fashioning equitable relief, see *ERISA Litigation Handbook*, § 3.05[D][2] (2004 Supp.) for a non-exhaustive list of thirteen (13) different types of equitable relief awarded.

To buttress his position, Bickley has filed a copy of an *Amicus* Brief filed by the Secretary of Labor in a case pending in the 9th Circuit where the Secretary takes the position that § 502(a)(2),

---

[11]*Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 146 (1985).

[12] At the end of *Moore*, the Court briefly discussed the plaintiffs' claim for equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), relief sought here by Bickley. The Court did not address the viability of that claim with anything approaching the detail of its analysis of the derivative action for unpaid contributions, *supra*, but did say that what was required was "...at a bare minimum, an allegation of what law these defendants purportedly broke". 216 F.3d at 1247.

[13] *But see, Weems v. Jefferson-Pilot Life Ins. Co.*, 663 So.2d 905 (Ala.) (ERISA allows court to award extra-contractual and punitive damages), *cert. denied*, 516 U.S. 971 (1995).

through reference to § 409(a), 29 U.S. C. 1109(a), "permits courts to impose personal liability on breaching fiduciaries for any 'losses' to the plan, and subject them to 'such other equitable or remedial relief as the court may deem appropriate'" Doc. 113 *(quoting, Clanton v. Advance Health, L.P.* Case No. 04-15328 (9th Cir. 2004)).  The Secretary, while taking no position on whether the *Clanton* PBM (Advance) is an ERISA fiduciary (named or functional), or whether it violated any ERISA duties, supports the *Clanton* plaintiffs' right to the relief sought: an Order that their plans be made whole and that Advance, if a breaching fiduciary, be enjoined from illegal practices in the future and be held liable to return any ill-gotten profits obtained through the use of plan assets. Plaintiffs/Appellants in *Clanton* say, like Bickley here, that the rebates and discounts obtained by the PBM represent an increased profit to the PBM generated through the use of plan assets and argue, as Bickley does, that the PBM is an ERISA fiduciary.

The court, given the reasoning of *Moore*, is reluctant to hold that the Eleventh Circuit would agree with the Secretary's position to the extent that the Secretary says plan participants can bring derivative actions against PBM's under these or similar facts.  While *Moore* involved unpaid contributions, not at issue here, and a different part of the Act[14], the Court drew a pretty clear distinction between actions brought by Plan participants regarding benefits due the participants on the one hand, and litigation against third parties where the benefits accrue to the Plan on the other. It is this distinction and the reasoning underlying it that leads this court to conclude that were the Court of Appeals squarely presented with this precise question of Bickley's standing, it would say

---

[14] § 502(g)(2), 29 U.S.C. § 1132(g)(2).

Bickley lacks standing.[15]   The *Moore* Court noted that the Plan Administrator, like any trustee, is vested with a breadth of discretion concerning whether or not to bring a lawsuit, recognizing that a Plan Administrator or Trustee could decide, for various reasons, that just because a suit can be filed does not mean that it should be filed.  Permitting Bickley to essentially make that decision for the Plan is allowing Bickley to substitute his judgment for the Plan's.[16]  *Moore, supra*, 216 F.3d at 1245-46.

The issue is not whether or not a plan participant like Bickley can ever bring an ERISA enforcement action against a third party; the statute clearly contemplates some third party actions. Rather, the issue here is whether Bickley can, like the *Clanton* plaintiffs, sue on the Plan's behalf to first classify Caremark as an ERISA fiduciary to the Plan and its members, and then force Caremark, as a breaching ERISA fiduciary, to return to the Plan the profits realized through rebates, coupons, pricing spreads, and other income realized through the challenged activities.

The court has not found any case where the Eleventh Circuit has answered this question, nor do the parties cite to any such authority.  There is authority elsewhere on the standing question that supports Bickley's ability to sue on behalf of the Plan,[17]  but that authority is not on all fours with the standing question presented here and the court does not see how any of the authority that Bickley cites, including the Secretary of Labor's *Amicus* Brief in *Clanton*, *supra*, overcomes *Moore*'s

---

[15]   Of course, if Caremark is not an ERISA fiduciary, this issue will not arise at all.  <u>See</u> Section D., *infra*.

[16]   And, since Bickley seeks national class action status, the judgment of the administrators or trustees of all the other plans where Caremark is the PBM.

[17]   *Russell, supra*, 473 U.S. 134, 142 n.9; *Smith v. Provident Bank*, 170 F.3d 609, 616 (6th Cir. 1999) ("ERISA authorizes participants to sue on behalf of a plan...which is...the mechanism which Congress established to enforce the plan's right to recover for breach of fiduciary duty.")

reasoning.  It may be that were the Secretary of Labor to file a similar Brief in this Circuit, the deference accorded by courts to the administrative agency charged by Congress with administering a statute might lead to a different interpretation or result.  That set of facts is not before this court, however, and the court holds that under the *Moore* analysis, even to the extent that Bickley seeks relief on behalf of the Plan where the remedies obtained (monetary or injunctive) would go to the Plan, not the Class, Bickley lacks standing.  The court says that the underlying rationale of *Moore*,[18] that lower courts avoid reading new causes of action into ERISA, controls.  *See Moore,* 213 F.3d at 1243 (criticizing the failure of other Circuits to treat a beneficiary's right to sue as a matter of statutory construction and noting that those Circuits that had found beneficiary standing had not considered those decisions in light of *Russell* and *Mertens*, *supra*).

The court holds that Bickley lacks derivative standing to bring this enforcement action under the Act on behalf of the Plan.[19]

D.  Fiduciary Status

Under ERISA, a fiduciary has duties that run directly to Plan participants and beneficiaries. See § 29 U.S.C. 1132(a)(2) & (a)(3).  Fiduciary status can be acquired by definition or by acting like a fiduciary.  Bickley does not assert that Caremark is a named fiduciary.  The question then is whether Caremark's activities relating to the Plan are such that Caremark has acquired ERISA

---

[18]  Equally applicable to the discussion of fiduciary status that follows, see D., *infra*.

[19]  As to Article III standing, the court does not doubt that, for the reasons set out in the Secretary of Labor's *Clanton* brief, Plan participants have Article III standing, and does not believe that the arguments to the contrary merit further discussion.

fiduciary status, *see* 29 U.S.C. § 1002 (21)(A).[20]  Put another way, the question is "not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint".  *Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 313 (D.N.J. 2003) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 222, 226, 120 S.Ct 2143, 146 L.Ed.2d 164 (2000).  "Even if an entity is an ERISA fiduciary for some purposes . . . not every action the entity takes must benefit plan beneficiaries" and thus, not every action will subject it to fiduciary liability under section 502(a)(3)."  *Id.*  ERISA fiduciary status "is not an all or nothing concept.  A court must ask whether a person is a fiduciary with respect to the particular activity in question."  *Moench v. Robertson*, 62 F.3d 553, 561 (3rd Cir. 1995) (internal quotations omitted) (quoted in *Group Hosp. & Med. Svcs. v. Merck-Medco Managed Care, LLP*, 295 F.Supp. 2d 457 (D.N.J. 2003)).

Even where the PBM has discretionary authority over certain aspects of the PBM, ERISA fiduciary status is not a foregone conclusion.  Earlier this year, in an MDL class action involving Medco[21] where Medco did have discretionary authority over aspects of the drug benefits plan, the

---

[20] That code section provides in part: "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

[21] The former PBM for the FEP BC/BS health insurance plan that provide(s)(ed) health insurance for federal judiciary employees, including this judge.  The court disclosed *sua sponte* at a November 17, 2004, hearing that Caremark has or is about to become the PBM for the FEP BC/BS health insurance plan, and directed the parties to file a joint Motion to Recuse if deemed appropriate.  No Motion was filed and the court believes recusal is not appropriate under these facts; *see* the discussion of futility in the court's November 17, 2004, Order.  (Doc. 120.)

District Court (Brieant, J.), while approving a $42.5 million dollar settlement for a class exceeding 850,000 members, made these observations about PBM's as fiduciaries:

> - This case presented complex factual and legal issues.  The case presented a question of first impression, whether pharmacy benefit managers (PBM's), like Medco, are fiduciaries as defined under ERISA.
>
> - The claims present unique questions of the applicability of ERISA to PBM's.  Their viability is unknown, and securing an award for damages and injunctive relief for Class Plaintiffs is a reasonable strategy in the course of litigation.
>
> - It is unlikely in this Court's view that a significantly larger judgment could be recovered after a jury trial.  Class Counsel concluded that there was a good chance that Plaintiffs were unlikely to prevail on their ERISA claims."

*In Re: Medco Health Solutions, Inc. Pharmacy Benefits Management Litigation*, 2004 WL 1243873 (S.D.N.Y. 2004).

The most important factor in determining fiduciary status is whether the entity/party has discretion over benefits awarded to plan participants.  ERISA "provides that not only the person named as fiduciaries by a benefit plan, see § 29 U.S.C. 1102(a), but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets, *see* 29 U.S.C. § 1102(21)(A), is an ERISA 'fiduciary'".  *Mertens, supra*, 508 U.S. at 251.   The core of fiduciary status under ERISA is discretion.  *Curcio v. John Hancock Mutual Life Insurance Co*., 33 F.3d 226, 233 (3rd Cir. 1994).

The court has been able to find only one reported appellate decision on PBM conduct similar to that alleged by Bickley here.  In *Seaway Food Town, Inc. v. Medical Mutual of Ohio*, 347 F.3d 610 (6th Cir. 2003), a corporate employer filed an ERISA action against the Plan Administrator alleging many of the same things Bickley alleges against Caremark: breach of fiduciary duty relating to failure to disclose amount of drug discounts, failure to describe the true nature of provider

discounts actually received, and failure to pass along those discounts to the employer.  The Court held that the plan administrator was not an ERISA fiduciary because the administrator's contracts with the employer authorized the plan administrator to retain for its "sole benefit" the funds received from provider discounts.  If followed, *Seaway Food* answers at least one of Bickley's claims: the PBM Agreement   at Section 2.e., page 3 explicitly allows Caremark to receive rebates from drug manufacturers.  The same analysis would apply to the [ambiguous] "financial relationship" between Caremark and drug manufacturers permitted at Page 2.e, <u>Formulary Program</u> of the PBM, set out earlier.[22]

This contractual provision does not explicitly answer the same question as to coupons, pricing spreads, and any other means by which Caremark realizes additional income from third parties by virtue of its PBM status, although the court expects Caremark would say that these mechanisms are sufficiently similar to rebates that it can be implied that they are permitted under the PBM.[23]  In any event, *Seaway Food Town, supra*, left for another day and court the question whether the converse could also be true: fiduciary status is conferred by the failure of the contract to explicitly allocate to the PBM the "benefits" realized from discounts, coupons, rebates, and the like.[24]

Perhaps more on point with Bickley's claims is *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737 (7th Cir. 1986), where the Seventh Circuit, clarifying an earlier case, said:

---

[22] While the words "financial relationship" are hardly enlightening to the uninformed reader, the court says that a "financial relationship" means money changes hands and the only questions are how much and who gets it.

[23] And Caremark may have said just that; if it has, the court did not see it.

[24] Neither the First Agreement nor the PBM Agreement say anything about any of these matters.

> *Schulist* stands for the proposition that if a specific [contract] term (not a grant of power to change terms) is bargained for at arm's length, adherence to that term is not a breach of fiduciary duty.[25]

In his Supplemental Brief filed December 2, 2004, doc.121, page 2., fn. 1, Bickley cites *Brown v. Blue Cross Blue Shield*, 898 F.2d 1556, 1565 (11th Cir. 1990), apparently for the proposition that it is not necessary in the Eleventh Circuit to show that a plan beneficiary was harmed by fiduciary conduct if that fiduciary allowed itself to be placed in a position where its personal interest might conflict with the beneficiary's.[26]  A review of Bickley's other authority, *e.g., Leigh v. Engle*, 727 F.2s 113, 121-122 (2nd Cir. 1984) (pension plan trustees used plan assets for private business venture, breaching their fiduciary duty) leads the court to infer that Bickley's point here is that use of plan assets can or does confer fiduciary status on the user.  This assumes rather than proves Bickley's fiduciary argument: that the monies Caremark makes from discounts, rebates, coupons and the like, **are** Plan assets and as such, need to be disgorged back into the Plan.

---

[25]  As noted earlier, Illinois law controls the PBM Agreement, and the court thinks that the Seventh Circuit is, after the Eleventh, a logical place to look for help with the law.

[26] *Brown* is most notable for its discussion of the appropriate standard of review applied to an ERISA fiduciary's decision.  Blue Cross Blue Shield ("BC/BS") was the Plan Administrator and paid the benefits on behalf of plan members.  Because BC/BS both made the decisions on benefits and paid the benefits if awarded, it placed itself in conflict between its profit motive (more money by denying claims) and its fiduciary duty to plan beneficiaries (pay all claims covered by the Plan).  *Id*.  As a result, the traditional deference given to a Plan Administrator, abuse of discretion, was replaced by the higher arbitrary and capricious standard of review.  Further, the discretion vested in the Plan fiduciary, and therefore the appropriate standard of review accorded the Plan fiduciary, is found by a review of the Plan document(s), and does not have to be included in the Summary Plan Description ("SPD").  *Cagle v. Bruner,* 112 F.3d 1510, 1517 (11th Cir.1997) (in the Eleventh Circuit, courts "look to all of the plan documents to determine whether the plan affords ... enough discretion to make the arbitrariness standard applicable.").  The court reads *Cagle* to say that discretionary language found in the Plan Specifications is sufficient to require application of the arbitrary and capricious standard of review, even if such language is not also located in the Summary Plan Description.

Applying this body of law to the facts at hand, the court says that it cannot see how Caremark could be an ERISA fiduciary to Bickley.  Further, in the absence of facts suggesting Caremark owes some duties to the Plan not disclosed in the First and PBM Agreements, the court does not see how Caremark is an ERISA fiduciary to the Plan.  The PBM Agreement does not give Caremark discretion over benefits decisions.  A fair characterization of Caremark's obligations thereunder is "ministerial", and the drug benefits Caremark provides are paid by the Plan.  The major potential conflict between Caremark and the Plan members like Bickley would be where Caremark denies a prescribed drug benefit as falling outside the Plan's coverage, which is not alleged in the SAC or otherwise at issue in this action.  The "bad acts" attributed to Caremark strike the court as looking a lot like state law fraud claims, where Georgia-Pacific, not Bickely, would be the defrauded party: Caremark either concealed from the Plan or misrepresented to the Plan Caremark's compensation arrangements with the drug manufacturers and pharmacies, and its use of pricing spreads.

The court recognizes that, were Caremark found to be an ERISA fiduciary, its compensation derived from undisclosed rebates, coupons, pricing spreads and other activities could be difficult to defend from a claim of self dealing prohibited by 29 U.S.C. § 1106(b)(1) & (b)(3).  But this argument begs the question; if Caremark is not an ERISA fiduciary, its contractual arrangements with the Plan, even if disadvantageous to the Plan, do not convert Caremark into an ERISA fiduciary who has to give up its ill-gotten gains.  Making an advantageous contractual agreement with an ERISA plan does not make one an ERISA fiduciary, *Miniat v. Globe Life, supra*, 805 F.2d at 737.[27]

---

[27]  The court does not have before it the question whether defrauding the ERISA plan in pre-contract negotiations (e.g. fraud in the inducement of the PBM Agreement) would create fiduciary status, and expresses no opinion.  Fraud by a PBM in the performance of a PBM contact would be a much stronger case for finding the PBM an ERISA fiduciary.

Creation of ERISA fiduciary status, particularly on a derivative claim, is not something to be undertaken lightly.  Were this to be done, the appropriate court(s) to do so would be the Court of Appeals or the Supreme Court.  *Aetna Health Inc. v. Davila*, 124 S.Ct. 2488, 2495 (2004), *supra*. Were Georgia-Pacific the plaintiff, Bickley's arguments would carry a lot more weight because, at the end of the day, it probably is all Georgia-Pacific's money[28], and the argument that Caremark is using plan assets to enrich itself would have more traction.  Even then, the fit would not be exact; the court reads the PBM Agreement to provide that Caremark is not given (nor does it have control over) Plan money which Caremark then diverts to its own interests, rather, the allegation is that Caremark negotiates, in the form of discounts, rebates, and coupons, drug prices that are more favorable than those charged the Plan and keeps the difference, or "spread."

For many of the same reasons discussed in F. Exhaustion, the court also says that the ERISA fiduciary issue should first be addressed by the Plan Administrator, who has contractual privity with Caremark and to whom Caremark owes certain duties.  If the Plan Administrator were to assert that Caremark is an ERISA fiduciary to the Plan, and that Caremark has breached its fiduciary duties to the Plan, the court would have to consider those allegations and the facts supporting them.  But Bickley is not the Plan Administrator, and the court is unwilling to say that Bickley knows better than the Plan Administrator what is best for the Plan *viz-a-viz* Caremark and the PBM Agreement.

Were Georgia-Pacific to file a Complaint alleging that it knew nothing about the discounts,

---

[28] If, as the court assumes, even employee contributions to the Plan come from Georgia-Pacific funds deducted from wages paid out by Georgia-Pacific, or in the case of expenses like "co-pays" for drug prescriptions, from wages paid by Georgia-Pacific to those employees.

coupons, and other activities described in the SAC[29], and particularly were it to further allege as noted above that its bargain with Caremark was induced by representations that Caremark's compensation therefrom was only that set forth in the PBM agreement, or that all other cost savings would be the property of Georgia-Pacific, the court would be far more receptive to a claim that Caremark was, as to Georgia-Pacific at least, an ERISA fiduciary, if for no other reason than Caremark obtained its "ill-gotten gains" only because it had a contract with an ERISA plan, and the gains themselves were induced by fraud.[30]

This reasoning does not apply with anything approaching similar weight when it comes to a Plan participant like Bickley.  Rather, it strikes the court that the gravamen of Bickley's SAC is that Georgia-Pacific made a bad bargain with Caremark, that Caremark is amassing great wealth thereby, and that some or all of this wealth should be returned to Georgia-Pacific or its hourly employees in the form of lower Plan premiums and costs.  The court, like any one who reads about business, is aware that business people make horrendously bad bargains from time to time, with the result that the other party to the contract reaps great rewards.  Absent fraud or other statutory justification for avoidance of contract performance or imposition of ERISA status on Caremark, it

---

[29]  As already noted, the PBM explicitly allows Caremark to receive rebates from drug manufacturers.

[30]  Bickley says Georgia Pacific will do nothing, citing the May 6, 2003 letter from Raymond Johnson to Jody Hunter of Georgia-Pacific, attached to Plaintiff's Sur-Response to Defendants' Response to Plaintiff's Second Amended Complaint.  The court says this document shows notice, but it would be speculative to say the letter, and silence from Georgia-Pacific, definitively show that referring Bickley's complaints to Georgia-Pacific as Plan Administrator would be futile.  Georgia-Pacific may respond in a manner Bickley does not agree with (as discussed above), or it may respond in a manner he only partially agrees with, but the court has no doubt that Georgia-Pacific will respond.  Its role as Plan Administrator doesn't leave it much room to do otherwise.

is not the court's role to redraw contracts, particularly those made between entities such as Georgia-Pacific and Caremark, who both have the resources to negotiate terms deemed favorable to them.

In summary, the court does not find that Caremark is an ERISA fiduciary under the PBM Agreement.  The PBM Agreement, or the practices alleged by Bickley, do not constitute Caremark's "taking advantage of the trust and discretion with which [defendants] have been afforded, in order to negotiate or otherwise retain additional undisclosed compensation to Caremark with plan assets and to deprive the Georgia Pacific Plan, and its participants such as Mr. Bickley, of rebates, discounts, and other pricing advantages which had been ostensibly agreed upon".  Plaintiff's Supplemental Brief in Opposition to Defendants' Motion to Dismiss at pp. 8-9.

E.  Rule 23.1

Caremark seeks to dismiss Bickley's Amended Complaint on the grounds that it does not meet the requirements of F.R.Civ.P. Rule 23.1.  Specifically, Caremark says Bickley has failed to make demand on the Plan or the Plan Administrator (Georgia Pacific) that suit be filed or to allege that such a demand would be futile.  Caremark says this is required under Rule 23.1 because Bickley's class is a F.R.Civ.P. 23.1 class.  Rule 23.1 Complaints are to be verified as well; Bickley's Amended Complaints are not verified.

At the risk of repeating itself, the court incorporates by reference the discussion earlier and in F., Exhaustion, *infra*, about ERISA's integrated and comprehensive statutory enforcement scheme and says that, lacking definitive precedent to follow, it believes compliance with ERISA itself is sufficient, and that it would be at odds with ERISA's statutory scheme to graft onto an ERISA enforcement action the additional requirements of Rule 23.1.  Caremark's Rule 23.1 Motion is not well taken and it is not necessary for an ERISA plaintiff to fulfill those requirements if the plaintiff's

23

pleading otherwise satisfies ERISA's requirements.

F.  Exhaustion

Under Eleventh Circuit jurisprudence, "a plaintiff must exhaust a plan's administrative remedies before bringing an ERISA suit." *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir.1990) (citing *Mason v. Continental Group, Inc*., 763 F.2d 1219, 1227 (11th Cir.1985), *cert. denied,* 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986)). The *Curry* court specifically explained that *Mason* should not be read "as overruling well-established exceptions to the exhaustion requirement." *Id.* at 846. Indeed, Eleventh Circuit case law excuses the exhaustion requirement in two circumstances: "only when [1] 'resort to administrative remedies would be futile or the remedy inadequate,' *Counts,* 111 F.3d at 108, or [2] where a claimant is denied 'meaningful access' to the administrative review scheme in place, *Curry,* [891 F.2d at 846-47]." *Perrino,* 209 F.3d at 1315.

Bickley does not allege he has exhausted administrative remedies.  He says the SAC satisfies the "futility" exception.[31]  Bickley says that there is no applicable administrative remedy and that because ERISA fiduciary status is a question of law, the Plan Administrator has no discretion or authority to determine whether Caremark is indeed an ERISA fiduciary.  Even if the Plan Administrator could so determine, the Administrator has no power to enforce Section 409  of the Act, or to order or compel Caremark to return plan losses or to establish an equitable constructive trust over its ill-gotten gains. Doc. 86, pp.14 - 15.  And, if the administrative review process is that set forth in the  Plan, Ex. A to doc. 62, the appeal would go to Caremark as the Benefits Claim

---

[31]  Caremark says the court should strike the SAC as inappropriately filed.  The court, in the exercise of its discretion, declines to do so.

Processor, not Georgia Pacific as the Plan Administrator.  Bickley cites *Perrino v. Southern Bell*

*Telephone & Telegraph*, 209 F.3d 1309 1318 (11th Cir. 2000), for the proposition that "there are

situations where an ERISA claim cannot be redressed effectively through an administrative scheme.

In these circumstances, requiring a plaintiff to exhaust an administrative scheme would be an empty

exercise in legal formalism."

      Strictly speaking, neither ERISA nor the Department of Labor ERISA claim review

regulations contain provisions requiring exhaustion of administrative remedies.[32]  The Fourth and

Ninth Circuits, and some District Courts, have held that claims for  breach of fiduciary duty do not

require exhaustion of administrative remedies because they do not involve a violation of rights "for

which ERISA provides an administrative forum".  *Smith v. Sydnor, Inc*., 184 F.3d 356, 364 (4th Cir.

1999), *cert. denied*, 528 U.S. 1116 (2000); *Lee v. Continental Can Co*., 724 F.2d 247 (9th Cir.

1984).[33]  There is even authority for the proposition that the application of the exhaustion doctrine

is left to the discretion of the trial court, i.e. failure to exhaust is not an absolute bar to a civil action.

The better practice would require that all plan remedies be completed or, if there are no remedies

---

[32]  The Act does require a Plan to provide a claims and appeal procedure.  ERISA § 509, 29 U.S.C. § 1103.  This is a mechanism whereby a plan participant may request and receive an explanation regarding a benefits decision.  *See also* DOL Reg. 29 C.F.R. § 2560.3.503-1(b)(1).  Neither ERISA nor the DOL regulations explicitly make use of a claims and appeal procedure, or any other administrative procedure, a precondition to filing an ERISA action in the District Court.

[33]  Interestingly, the Ninth Circuit provided one of the early expositions of the rationale for requiring exhaustion: a method of reducing the number of frivolous lawsuits, for promoting the consistent treatment of benefit claims and a nonadversarial method of claims settlement, and for minimizing cost.  *Amato v. Bernard*, 618 F.2d 559 (9th Cir. 1980).  The 11th Circuit, in *Perrino*, *supra*, added other equally cogent reasons: including that allowing the plan administrators to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decision making process, and requiring exhaustion is consistent with the Congressional intent that pension plans provide review procedures.

specified in the plan, that a practitioner representing a participant or beneficiary confirm in writing that the plan does not specify an internal procedure. *Kross v. Western Electric Co*., 701 F.2d 1238. (7th Cir. 1983), (*cited in* Cooke, ERISA Practice and Procedure, Thomson/West (2002) § 8:19 at pp 8-165-66)).

ERISA exhaustion requirements do not appear to be either as flexible or as discretionary in this Circuit. A review of Eleventh Circuit exhaustion jurisprudence reveals that the Court of Appeals has consistently required exhaustion of administrative remedies in ERISA cases. The Eleventh Circuit's exhaustion rule could be characterized, practically speaking, as "if in doubt, exhaustion is required". In *Counts v. Am. Gen. Life & Acc. Ins. Co*., 111 F.3d 105, 108 (11th Cir. 1997), the Court said "ERISA plaintiffs must exhaust available remedies before suing" (citing *Springer v. Wal-Mart Assoc.'s Group Health Plan*, 908 F.2nd 897, 899 (11th Cir. 1990)); *Mason v. Continental Group, Inc*., 763 F.2d 1219, 1225-27 (11th Cir. 1985). *Counts* says exhaustion applies to both claims to recover benefits and to actions to enforce a statutory right under ERISA.[34]

In light of *Counts*, *Springer*, and *Mason*, Bickley has a heavy burden to excuse his failure to exhaust. His first futility argument, that there is no administrative remedy, is not supported by the Plan document, discussed in some detail at pages 5 - 7, above. That discussion will not be repeated here. Suffice it to say that Wausau is identified at page 3. of the Plan as the Benefits Claim Processor ("Plan BCP"); Caremark is identified there as the Prescription Drug Claims Processor. Wausau, not Caremark, decides any appeal from the denial of benefits. The court reads the Plan as saying that Wausau would hear any appeal of a Caremark decision. And, as noted earlier, Georgia-

---

[34] The fiduciary claims in this action are statutory if they are anything. Bickley makes no claim that Caremark has denied a drug benefit owed him under the Plan.

Pacific has the exclusive responsibility and complete discretionary authority to control the operation and administration of the Plan, with power to resolve all interpretive, equitable, and other questions that arise in the operation of the Plan.  *Plan*, 81.

Taking all of these provisions as a part of an integrated Agreement and viewing the same provisions in the light of ERISA's integrated statutory scheme, the court believes that Bickley and other Plan members do have an administrative remedy.  While the Plan provisions for review of benefit claim denials could be more clearly written, the court doesn't think it's a stretch to say that any Plan participant unhappy with a benefits decision can take the matter to Wausau for review, and such participant can clearly take a complaint or concern over the operation and administration of the Plan, including any **equitable** questions, to Georgia-Pacific, the Plan Administrator.  (Emphasis supplied.)

Taking the analysis a step further by using Bickley's SAC as a Plan benefit denial or, perhaps more accurately, a Plan benefit complaint, the court again says that Wausau, as the Plan BCP, and Georgia-Pacific, as Plan Administrator should, and the court expects would, be in a position to receive and review Bickley's complaint, and respond to it.  (Emphasis supplied.)  The court thinks that the inclusion of information about the Plan acting through its Chairman, Vice-Chairman, CEO, President, CFO, Vice President of Compensation of Benefits or Vice President - Human Resources means that some or all of those individuals have the power to receive and respond to complaints such as Bickley's.  In some respects those individuals may be better situated than Wausau because one or more of those officers are involved in the Plan on an ongoing basis, and one or more of them were likely involved in or privy to the PBM Agreement negotiations between Georgia-Pacific and Caremark.

The suggestion that taking Bickley's claims to Wausau or to Georgia-Pacific acting through one of the Georgia-Pacific officers listed at page 84 of the Plan would be futile, strikes the court as speculative.  It may develop that Georgia-Pacific may not know or care about the discounts, pricing spreads, or other allegedly improper Caremark activities.  Alternatively, while not reflected in the PBM Agreement, Georgia-Pacific may have known during the PBM Agreement negotiations that Caremark made money or planned to make money through those mechanisms and Georgia-Pacific took that into account while negotiating the PBM Agreement.[35]

Bickley's second reason for not exhausting administrative remedies is that the Plan can't say whether or not Caremark is an ERISA fiduciary because doing so requires interpretation of the statute.  While Bickley's assertion is true in a *Marbury v. Madison*[36] sense that neither Caremark, Wausau, or Georgia-Pacific can say as a matter of law whether Caremark is or isn't an ERISA fiduciary, this argument is more philosophical than real.  Businesses and individuals, acting on their own but more often through counsel, communicate every day with those with whom they have disputes or conflicts, and in those communications assert that the other part(y)(ies)' conduct is in violation of statutory or common law.  There is no reason that Wausau or the (Georgia-Pacific) Plan itself cannot call on Caremark to account for the monies received through coupons and pricing spreads, or to justify the other practices Bickely says violate ERISA.  There is no reason why the

---

[35]  These observations are equally speculative, but with one significant difference: if exhaustion is required, Georgia-Pacific will either address the rebate/coupon/pricing spread issues or it won't.  Failure to address these issues on their merits could bolster a claim that Georgia-Pacific is not acting in the best interests of its Plan participants.  Further, a reviewing court will have an administrative record showing what action was or wasn't taken, and won't have to speculate about what the Plan knew and when it knew it.

[36]  5 U.S. 137 (1803) (the judicial power includes the power to definitively say what the law is).

28

Plan cannot assert that, as to the Plan, Caremark is indeed a statutory fiduciary and therefore subject to the duties and obligations of the Act. And there is no reason why, if dissatisfied with the answers it receives, the Plan cannot bring an action against Caremark under the Act and assert some if not all of the claims Bickley asserts here.

A major advantage of giving the Plan (acting through Wausau or Georgia-Pacific) the opportunity to review Bickley's complaints is that if the Plan or Bickley return to court with these or similar claims, there will be an administrative record for the court to review. The court views the ERISA statutory review scheme as premised on the district court having the administrative record before it when it passes on ERISA disputes. Besides avoiding the substitution of judgment problem discussed in *Counts*, *supra*, requiring the disputes in this action to first be addressed by the Plan (and by implication, Georgia-Pacific itself) potentially avoids litigation on claims that may resolve in the administrative process. Finally, it avoids the risk of the court deciding disputes prematurely. All three (3) reasons are consistent with the proper role of a district court as well as serving the interests of judicial economy.[37]

Bickley's third reason for the futility of exhaustion is that drug benefit questions are referred to Caremark. This is Bickley's best argument; it is unlikely that Caremark is going to change its practices and it is close to certain that Caremark is not going to agree it is an ERISA fiduciary or that it has violated the Act.[38]   The answer to this contention is that the Plan's appeal procedure

---

[37] The downside of exhaustion and administrative review, at least as to plaintiffs like Bickley, is that the District Court, when reviewing the Plan's response, will not use a *de novo* standard. Proceeding with the action without exhaustion or administrative review would, practically speaking, result in a *de novo* review. *Cf. Brown, supra*.

[38] Caremark says in its Motion that administrative review will show that no harm has been done to the Plan. Doc. 62 at 18. The court wonders how Caremark knows this.

contemplates Wausau and Georgia-Pacific, not Caremark, will make the final decision.[39]

The court is persuaded that, if there is to be a balancing of interests here, the scale tilts towards requiring exhaustion of administrative remedies. Requiring exhaustion should not be read as a blessing or stamp of approval on the alleged Caremark business practices. The court expresses no opinion on those practices because those practices are not before it. The court's research and the parties' filings show there are a number of similar PBM cases pending in other federal courts raising the same claims of ERISA applicability to PBM's and PBM's alleged misuse of discounts, rebates, coupons and the other practices described in the SAC. Some and probably all of the legal questions surrounding PBM ERISA fiduciary status, including who can sue PBM's and what relief a plan participant can obtain from a PBM if such suits go forward, will undoubtedly reach the Court of Appeals in this and other Circuits. All the court can say at this point is that it does not believe its role is to reach them today any further than it needed to do in this Opinion.

A separate Order will be entered in accordance with this Opinion, dismissing the action without prejudice for failure to exhaust administrative remedies. Further, without regard to exhaustion, the Second Amended Complaint will be dismissed with prejudice because Bickley lacks standing to bring the action and because, under the PBM Agreement, Caremark is not an ERISA fiduciary as to Bickley.[40] Also, for the reasons stated above, the SAC will be dismissed with

---

[39] As previously noted, the Plan provides for review of questions or complaints by Georgia-Pacific.

[40] The court does not rule whether Caremark is an ERISA fiduciary as to Georgia-Pacific (in spite of the opinion expressed that Caremark is not) because Georgia-Pacific is not before the court as a party. It would be inconsistent to say Bickley cannot assert the Plan's rights derivatively and then rule, in the Plan's absence, on whether or not Caremark is an ERISA fiduciary to the Georgia-Pacific Plan.

prejudice as to Caremark Rx, Inc.

    Entered this the <u>30th</u> day of December, 2004.


**VIRGINIA EMERSON HOPKINS**
United States District Judge

31